FRANK SUTER, PLAINTIFF-RESPONDENT, v. SAN ANGELO
FOUNDRY & MACHINE COMPANY,
DEFENDANT-APPELLANT.

Argued October 30, 1978—Decided July 31, 1979.

*Mr. Norman S. Costanza* argued the cause for appellant (*Messrs. Morrison & Griggs*, attorneys).

*Mr. Anthony R. Amabile* argued the cause for respondent (*Messrs. Witham, Amabile & Takvorian*, attorneys).

The opinion of the court was delivered by

SCHREIBER, J.

This products liability case projects for our consideration the impact of the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1 to 5.3, in strict liability actions.

Plaintiff Frank Suter sought monetary damages for injuries sustained when his hand was caught in the cylinders of an industrial sheet metal rolling machine. At the time, Suter was employed by, as well as part owner of, Accurate Sheet Metal, Inc., a small industrial fabricator of sheet metal products, consisting primarily of ducts for heating and air conditioning. Suter charged defendant San Angelo Foundry & Machine Company, the manufacturer of the machine, with negligence and with breach of an express and an implied warranty that the machine was safe and fit for its intended purposes and was of merchantable quality.

The trial court, however, charged the jury only on the theory of strict liability. The court posed the issue in terms of whether the product as designed by defendant was reasonably fit for the ordinary use for which it was intended, whether the defect arose out of its design and while it was under defendant manufacturer's control, whether the defect proximately caused the injury, and whether plaintiff was a reasonably foreseeable user of the product. The trial court also charged, over plaintiff's objection, that plaintiff would be guilty of contributory negligence if he had not exercised that degree of care which a reasonably prudent person would have exercised under the circumstances. Six questions were submitted to the jury. Those questions and the jury's responses were as follows:

1. Was the machine in question defectively designed by the defendant, San Angelo Foundry & Machine Co.? **YES** **NO**
 X

 If the answer to Question #1 is "no", you need go no further.

2. Was the defect a proximate cause of the accident? **YES** **NO**
 X

3. Was plaintiff, Frank Suter, guilty of negligence? **YES** **NO**
 X

4. Was that negligence, if any, a proximate cause of the accident? **YES** **NO**
 X

5. Taking the combined fault of the defendant and plaintiff that caused the accident as a total of

100%, what percentage of that fault was at-
tributable to:

 FRANK SUTER 50 %

 SAN ANGELO FOUNDRY &
 MACHINE CO. 50 %

 100 %

6. What sum of money would fairly, reasonably and adequately
compensate FRANK SUTER for his injuries and
losses; $25,000

The trial court denied plaintiff's motion to dismiss the defense of contributory negligence, applied comparative negligence as provided in *N.J.S.A.* 2A:15–5.1 to 5.3 which had become effective in August 1973 (the accident having occurred on November 14, 1974) and entered judgment for plaintiff in the amount of $12,500.

On plaintiff's appeal, the Appellate Division, relying upon *Bexiga v. Havir Manufacturing Corp.*, 60 *N.J.* 402 (1972), held in an unreported opinion that the defense of contributory negligence was unavailable. It modified the judgment by awarding plaintiff $25,000, the full amount of damages as fixed by the jury. We granted defendant's petition for certification, 76 *N.J.* 240 (1978).

The facts are virtually undisputed. Accurate Sheet Metal, Inc. (Accurate), located in Bloomingdale, New Jersey, was engaged in metal fabrication. Accurate had approximately 25 machines of various types, including a Lown 450, which it had purchased new in 1966. This machine, which had been built by defendant San Angelo Foundry & Machine Company, was used to flatten metal sheets and curve them into cylindrical shapes. Plaintiff had operated this piece of equipment on innumerable occasions between 1966 and the date of the accident in 1974.

The Lown 450 is powered by a one and one-half horsepower electric motor. The machine has three 50″ long rollers which resemble those of an old-fashioned clothes wringer. Metal sheets up to 48″ in width are fed between the two front rollers.

The metal is shaped into a cylindrical form when drawn upward and around by the rear roller. The right side of the machine is known as its "low end". The "low end" is equipped with a latched drop-arm which is used to open that side of the machine. Completed cylinders may then be removed. A cylinder may be reinserted for rerolling by opening up the drop-arm and sliding it back in along the bending rollers.

On the left side of the machine is a gear box cover which houses the motor. Mounted on the front of the cover is a control box which extends out from the face of the gear box cover. On the front of the control box are two buttons. One colored green and marked "start" is surrounded by a narrow collar so that it cannot be brushed accidentally. The other button, colored red, is designated "stop".

On top of the control box is a gear lever located 35″ from the floor. The lever, extending out 4¼″ from the front of the gear box, has three positions. When moved to the right, the rollers turn in a forward direction; when the lever is in the center, the rollers remain stationary; when moved to the left the rollers move counterclockwise.

A treadle, painted yellow, extends along the front base of the machine. If stepped on, it stops the machine by tripping out the relay and deactivating the motor. The machine would thereafter have to be restarted.

Pushing the green button activates the motor. However, the rollers do not turn until the lever is shifted to either the forward or reverse position. If the red stop button were pushed, the power would be cut off and the machine would stop. Touching the foot treadle would have the same effect. When using the machine, the operator leaves the power on until all the work is completed and relies principally on the lever to stop and start the rollers.

The accident occurred in the process of rerolling a metal cylinder that had been formed from a sheet 48″ by 48″. Four men, including plaintiff, had slipped the rolled metal through

the "low end" of the machine. The latched drop-arm was then closed. The motor was on, but the lever was in a neutral position so that the rollers were not moving. Plaintiff, while standing on the left side of the machine, saw a piece of slag lying in the metal cylinder. As he reached over to pull the slag out, his body brushed against the gear lever, pushing it into the forward position and activating the rollers.

The fingers of his right hand were caught and pulled into the rollers. He managed to yank his hand free, but only after it had been severely injured. Plaintiff was thereupon taken to a hospital, operated upon, and hospitalized. He returned to work about three weeks later.

Plaintiff's expert, an engineer, testified that the machine had been defectively designed. In his opinion a rotary guard should have been inserted around the lever or the lever mechanism should have been placed on top of the gear housing which is 45" above the floor. Either method would have served as protection against accidentally starting up the rollers. Both of these protective methods were in use when defendant made and sold this machine. As early as 1962 the National Safety Council had recommended installation of bar guards to prevent inadvertent striking of such levers.

Defendant's expert agreed that the rotary guard was an available design at the time the machine was made and that as a safety engineer he would have recommended such a device. In his opinion the accident occurred because plaintiff placed himself in an unsafe position while reaching inside the cylinder without first cutting off the power to the machine.

I

Our analysis of this case will focus first on the question of what types of conduct may constitute contributory negligence in a strict liability suit. Next we shall consider the applicability of the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1 to 5.3, to

that conduct. We shall then apply the principles so derived to the facts of this case.

Finally, we shall consider how a trial court should charge the jury on strict liability and its constituent elements. This consideration requires a review of the suggested instructions in *Cepeda v. Cumberland Engineering Co., Inc.,* 76 *N.J.* 152 (1978). The trial court's charge in this case will then be tested against the conclusions we have reached.

## II

We consider first the nature of a plaintiff's conduct which may bar recovery in a strict liability action. We have previously held that under some circumstances contributory negligence may be a defense. *Ettin v. Ava Truck Leasing, Inc.,* 53 *N.J.* 463 (1969); *Cintrone v. Hertz Truck Leasing & Rental Service,* 45 *N.J.* 434 (1965). However, the nature of that contributory negligence is sharply circumscribed. Thus, plaintiff's negligence is unavailable as a defense when it consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. See *Restatement (Second) of Torts* § 402A, Comment n (1965) [hereinafter recited as *Restatement*]. Comment n further explains that the "form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger * * * is a defense * * *." Thus, generally where a plaintiff with actual knowledge of the danger presented by the defective product knowingly and voluntarily encounters that risk, a trial court should submit the defense of contributory negligence to the jury.[1] See *Cintrone v. Hertz Truck Leasing & Rental*

---

[1]This bar to recovery attributable to plaintiff's conduct is to be differentiated from those circumstances in which no duty ascribable to "assumption of risk" applies. See *Meistrich v. Casino Arena Attractions, Inc.,* 31 *N.J.* 44 (1959); *McGrath v. American Cyanamid Co.,* 41 *N.J.* 272 (1963); James, "Assumption of Risk: Unhappy Reincarnation," 78 *Yale L.J.* 185 (1968).

*Service, supra,* 45 *N.J.* at 458–459. As in any contributory negligence context, it is the defendant's burden to prove that the plaintiff's conduct was improper and was a substantial factor in causing his injury.

We pointed out in *Cepeda v. Cumberland Engineering Co., Inc.,* 76 *N.J.* 152, 177–178 (1978), that an unforeseeable misuse of a product may not give rise to strict liability. As noted in that case, the use which the plaintiff makes of a product may be relevant on the plaintiff's case in the context either of showing that plaintiff's use of that product was outside or beyond its intended or foreseeable scope (thereby not being probative of whether the product was fit, suitable and safe), or that the abnormal use, rather than the defect, caused the injury. 76 *N.J.* at 176–177, see Twerski, "The Many Faces of Misuse: An Inquiry Into the Emerging Doctrine of Comparative Causation," 29 *Mercer L.Rev.* 403, 417–420 (1978).

It has been pointed out, for example, that the manufacturer of a knife cannot be charged with strict liability when the knife is used as a toothpick and the user complains because the sharp edge cuts. *General Motors Corp. v. Hopkins,* 548 *S.W.*2d 344, 349 (Tex.1977). This is the type of case referred to in Comment h to § 402A:

> A product is not in a defective condition when it is safe for normal handling and consumption. If the injury results from abnormal handling, as where a bottled beverage is knocked against a radiator to remove the cap, or from abnormal preparation for use, as where too much salt is added to food, or from abnormal consumption, as where a child eats too much candy and is made ill, the seller is not liable.

In other words, plaintiff's misuse of the product sheds no light on whether the product is reasonably fit and safe for its intended or reasonably anticipated use.

Misuse may also arise in connection with the question of operative causation. For example, where a surgical pin inserted to align a plaintiff's leg fracture and not for body support broke after the plaintiff, contrary to an express direction of his doctor, had walked upon the leg, it was held that the pin failed because

of its misuse. Though the pin's strength was shown to be less than intended, the evidence indicated that the pin would have broken in the absence of that weakening. *Stewart v. Von Sollrig Hosp., Inc.,* 24 *Ill.App.*3d 599, 321 *N.E.*2d 428 (1974).

■ Both of these situations must be distinguished from that in which the plaintiff's conduct surfaces as an affirmative defense. As noted above, this occurs when the plaintiff has voluntarily and unreasonably proceeded to encounter the known risk. Thus, contributory negligence in strict liability may exist only in this context.

## III

We pass next to the question of what effect, if any, the Comparative Negligence Act has on the contributory negligence defense in strict liability.

The act, adopted in 1973, provides:

> Contributory negligence shall not bar recovery in an action by any person * * to recover damages for negligence resulting in death or injury to person or property, if such negligence was not greater than the negligence of the person against whom recovery is sought, but any damages sustained shall be diminished by the percentage sustained of negligence attributable to the person recovering. [*N.J.S.A.* 2A:15–5.1]

■ The phrase "in an action * * * for negligence" may be read literally to refer only to the traditional negligence tort action. See *Kirkland v. General Motors Corp.,* 521 *P.*2d 1353, 1367 (Okl.1974). But such a reading is not in keeping with the spirit of the act. We must look to other indicia to illuminate the sense of the statute. We have frequently adverted to the interpretative guideline that statutes are to be read sensibly, the purpose and reason for the legislation controlling, rather than construed literally. See, *e. g., Schierstead v. City of Brigantine,* 29 *N.J.* 220, 230–231 (1959); *Alexander v. N. J. Power & Light Co.,* 21 *N.J.* 373, 378–379 (1956).

It was the legislative belief that the Comparative Negligence Act would ameliorate to some extent the harshness which could result in application of contributory negligence in all tort actions. Thus, when Governor Cahill signed the legislation, he commented that "[n]o longer will a seriously [injured] person be prevented from obtaining compensation for his injuries merely because he was partially responsible, in a minor way, for the accident in which he was injured." *Release from Office of the Governor,* May 24, 1973. The Governor's explanation was keyed to the equitable desire to mitigate the unfairness associated with the total bar to recovery posed by common law contributory negligence. When the Governor made this explanation in 1973, contributory negligence had been firmly established as a defense in a strict liability action and there is no reason to believe that the Legislature intended to exclude contributory negligence in a strict liability case. The identical conduct by a plaintiff would bar recovery in a negligence action and it was the softening of the effect of that type of conduct at which the act was aimed.

Some supportive legislative history may be found in the Legislature's conscious adoption of the Wisconsin comparative negligence statute, *Wis.Stat.Ann.* § 895.045 (West Supp.1978). The Wisconsin courts had previously applied its comparative negligence act to strict liability, *Dippel v. Sciano,* 37 *Wis.*2d 443, 155 *N.W.*2d 55 (1967); *Netzel v. State Sand & Gravel Co.,* 51 *Wis.*2d 1, 186 *N.W.*2d 258 (1971), and our Legislature may well have believed our statute would receive a comparable interpretation. See also *Hagenbuch v. Snap-On Tools Corp.,* 339 *F.Supp.* 676, 682–683 (D.N.H.1972), wherein the New Hampshire comparative negligence statute was construed to apply to strict liability on the basis of the Wisconsin statute and case law. For the proposition that interpretation of a statute of another state by its courts may serve as an interpretative aid when our Legislature has adopted the same act, see, *e. g., Todd Shipyard Corp. v. Tp. of Weehawken,* 45 *N.J.* 336, 343 (1965); *Bollinger v. Waga-*

*raw Bldg. Supply Co.,* 122 *N.J.L.* 512, 519 (E. & A.1939); *Rawson v. Lohsen,* 145 *N.J.Super.* 71, 77, (Law Div.1976).

We read the term "negligence" in our act as being subsumed within the concept of tortious fault.[2] So, too, contributory negligence has been regarded as a form of contributory fault. See *Ettin v. Ava Truck Leasing, Inc., supra,* wherein we commented that "though we consider it hardly necessary, the term 'contributory fault' could, if so desired, readily be substituted for the term 'contributory negligence'." 53 *N.J.* at 472; see also *Prosser, Torts* § 65, at 418 (4th ed. 1971). Dean Prosser has elucidated this idea of fault in the following manner:

> There is a broader sense in which "fault" means nothing more than a departure from a standard of conduct required of a man by society for the protection of his neighbors; and if the departure is an innocent one, and the defendant cannot help it, it is none the less a departure, and a social wrong. The distinction still remains between the man who has deviated from the standard, and the man who has not. The defendant may not be to blame for being out of line with what society requires of him, but he is none the less out of line. [*Prosser, supra,* § 75, at 493]

So viewed, the notion of fault is readily seen to be inherent in the concept of strict liability. The manufacturer or supplier of a chattel has been charged with the duty of distributing a product which is fit, suitable and duly safe. Failure to comply with this standard constitutes fault.

 Including as we do the act's use of the word "negligence" within the concept of fault, we construe the Comparative Negligence Act to require that the plaintiff's negligence must not be "greater than the negligence [or fault due to strict

---

[2]We recognize that Wisconsin's strict liability doctrine has been interpreted in terms of negligence per se, but the more persuasive legislative signposts indicate that the act was intended to cover fault in a broader sense rather than in the technical narrow negligence concept.

liability] of the person against whom recovery is sought, but any damages sustained shall be diminished by the percentage sustained of negligence attributable to the person recovering." *N.J.S.A.* 2A:15–5.1.[3] The trier of fact should ascertain the extent to which plaintiff's negligent conduct was a proximate cause of the accident. Since it is plaintiff's negligent conduct which may cause diminution or foreclosure of his recovery, ascertainment of the extent to which that conduct was a proximate cause of the accident should be determined by the trier of fact.

Although total-bar contributory negligence is not without its defenders, particularly among legal economists, see, *e. g., R. Posner, Economic Analysis of Law* 123–124 (2d ed. 1977); but see G. Schwartz, "Contributory and Comparative Negligence: A Reappraisal," 87 *Yale L.J.* 697, 721–727 (1978) (arguing that notions of economic efficiency provide no persuasive justifica-

---

[3]We are not unmindful that comparative negligence could be judicially adopted in strict liability cases. See *Ettin v. Ava Truck Leasing, Inc.,* 53 *N.J.* 463, 474 (1969) (indicating in dictum that judicial adoption of comparative negligence principles in strict liability cases might be welcome); *O'Brien v. Bethlehem Steel Corp.,* 59 *N.J.* 114, 126 (1971) (Francis, J., concurring) (suggesting that since bar of contributory negligence is judicially created, judicial authority to adopt comparative negligence is not open to reasonable question). Courts in other jurisdictions have declared that comparative negligence principles will govern ordinary negligence actions without prior legislative activity, *e. g., Li v. Yellow Cab of California,* 13 *Cal.*3d 804, 119 *Cal.Rptr.* 858, 532 *P.*2d 1226 (1975); *Hoffman v. Jones,* 280 *So.*2d 431 (Fla.1973). Even in instances in which the Legislature has enacted comparative negligence statutes that have been construed to be limited to negligence actions, it has been suggested that judicial action extending liability-dividing rules to products liability actions would be permissible since the defenses available to those actions are still subject to common law modification. V. Schwartz, "Strict Liability and Comparative Negligence," 42 *Tenn.L.Rev.* 171, 180 (1974).

· Of the 32 states with comparative negligence as of late 1976, in 29 the change was effected legislatively. See Sherman, "An Analysis of Pennsylvania's Comparative Negligence Statute," 38 *U.Pitt.L.Rev.* 51, 55 (1976).

tion for the traditional contributory negligence rule), the Legislature has at least partially rejected this point of view in favor of the simple principle that when two parties "share" (in a rough mathematical sense) the blame for an accident they should also share the costs. The liability-dividing principle of comparative negligence has received widespread support among the commentators as the preferred rule in negligence actions. See, e. g., Levine, "Buyer's Conduct as Affecting the Extent of Manufacturer's Liability in Warranty," 52 *Minn.L.Rev.* 627, 658–659 (1968). It has also been recommended as the sound rule for strict liability claims. See, e. g., id. at 644. Also note the recommendations in *U. S. Dep't of Commerce, Interagency Task Force on Product Liability, Product Liability* : 2 *Final Report of the Legal Study* 116 (1977), that comparative negligence should be applied in all products liability actions to relieve "some of the inequities incurred by both plaintiffs and defendants as a result of an 'all or nothing' approach to recovery." We are satisfied that the Legislature did not intend to exclude plaintiffs injured in strict liability situations from the Comparative Negligence Act and thereby subject them to a risk which might be extremely harsh.

In many situations plaintiffs have alleged both negligence and strict liability and sought recovery on either theory. To bar recovery because of contributory negligence when the plaintiff's theory was strict liability and to permit recovery in a reduced amount when the theory was negligence would be clearly inequitable and unjust. *Daly v. General Motors Corp.*, 20 *Cal.*3d 725, 738, 144 *Cal.Rptr.* 380, 387–388, 575 *P.2d* 1162, 1169–1170 (1978).

■ We hold that the Comparative Negligence Act is applicable to strict liability actions in those circumscribed areas in which plaintiff's conduct may be found to constitute contributory negligence. There remains for our consideration the application of this holding to the facts of this case.

## IV

In *Cepeda v. Cumberland Engineering Co., Inc.*, 76 *N.J.* 152 (1978), a closely divided Court held that a factory employee, whose hand was injured when it became caught in a machine which he was operating, could be barred from recovery because at the time he knew a guard device which would have prevented the accident was missing. This was so even though the manufacturer should have placed an interlock device on the unit, which would have rendered the machine inoperable in the absence of the guard. The case was remanded for a new trial on a theory of contributory negligence to consider whether plaintiff had unreasonably and voluntarily subjected himself to a known danger by operating the machine without the guard on it.

The incongruous results reached under the principles of *Cepeda* are dramatically exposed when this case is compared with *Cepeda*. In *Cepeda* the plaintiff, an 18-year-old from the Dominican Republic, who had completed only the second grade and come to this country when he was 16, was working in a large factory under the supervision of a foreman. He was operating a machine that cut plastic into pellets. It was reasonably foreseeable that the machine might be used without the guard in place—that being the reason why the manufacturer should have made it inoperable if the guard were removed. There was no evidence that he was operating the machine carelessly at the time of the accident.

On the other hand, in this case Suter purchased the machine for his company, had operated it "probably a thousand times" over an eight-year period and was completely conversant with every aspect of the equipment. He knew that he could deactivate the machine either by stepping on the treadle at his feet or pushing the stop button. He knew that pushing or moving the lever would activate the rollers. Suter was in charge of the operation at the time of the accident. Although he was careless in reaching into the machine and pushing the lever, under the

*Cepeda* doctrine, as a matter of law, he would not be guilty of contributory negligence.[4]

Cepeda, who was operating the machine carefully, may be barred from recovery. Suter, though careless, cannot be. It should not matter whether the manufacturer's duty is to prevent an employee from coming into contact with dangerous machine parts or to prevent an employee from accidentally setting a dangerous machine in motion. In the one instance, the risk is that the employee who knows the machine is on will accidentally get his hands caught in the machine and in the other that the employee will accidentally activate the machine, with the same consequences.

This peculiar result of applying contributory negligence to Cepeda and not to Suter is attributable to *Cepeda's* unjustifiable limitation of the principle we enunciated in *Bexiga v. Havir Manufacturing Corp.*, 60 *N.J.* 402 (1972). In *Bexiga* and its companion case of *Finnegan v. Havir Manufacturing Corp.*, 60 *N.J.* 413 (1972), a factory employee was using a punch press. Stepping on a foot pedal caused a ram to descend and punch a hole in a metal disc. Strict liability was imposed on the manufacturer for having failed to provide a safety device to prevent the operator's hands from being in the zone of danger when the ram was activated. The *Bexiga* Court noted that the plaintiff's negligence—placing his hand under the ram while at the same

---

[4]We have accepted our concurring colleague's interpretation and application of *Cepeda's* contributory negligence doctrine to the facts in this case. However, *Cepeda's* reasoning could arguably justify sending the issue of Suter's contributory negligence to the jury. Plaintiff Suter was completely familiar with the operation of the machine. He knew he could easily deactivate it by stepping on the foot treadle or he could avoid the lever by walking a few steps to the other side to extract the slag. There was some evidence that Suter had on prior occasions used the treadle to turn off the power to prevent the machine from being accidentally activated. It could be contended that, knowing these facts, he voluntarily and unreasonably exposed himself to the hazard.

time depressing the foot pedal—was the "very eventuality the safety devices were designed to guard against." 60 *N.J.* at 412. It reasoned that "[i]t would be anomalous to hold that defendant has a duty to install safety devices but a breach of that duty results in no liability for the very injury the duty was meant to protect against." *Id.* Under the special circumstances present in *Bexiga* of a factory worker injured while using an unsafe machine for its intended purposes, the "interests of justice dictate that contributory negligence be unavailable as a defense to either the negligence or strict liability claims." *Id.*

Before *Bexiga* was decided we had held that voluntarily encountering a known danger might constitute contributory negligence. *Cepeda's* classification of *Bexiga* within that same general category effectively eliminated the "special situation" to which *Bexiga* referred. In our view an employee engaged at his assigned task on a plant machine, as in *Bexiga*, has no meaningful choice.[5] Irrespective of the rationale that the employee may have unreasonably and voluntarily encountered a known risk, we hold as a matter of policy that such an employee is not guilty of contributory negligence. See 1 *R. Hursh & H. Bailey, American Law of Products Liability* 741 (2d ed. 1974). Accordingly, we reject *Cepeda's* limitation of *Bexiga* to those cases where there was no "indication that the unsafety of the machine was known" to the employee. 76 *N.J.* at 188.

The imposition of a duty on the manufacturer to make the machine safe to operate whether by installing a guard or, as in *Cepeda,* by making it inoperable without a guard, means that the law does not accept the employee's ability to take care of himself as an adequate safeguard of interests which society seeks to protect. The policy justification for *Bexiga* is sound. We see no reason to depart from *Bexiga's* elimination of contrib-

---

[5]We are not herein passing upon other situations wherein an employee may similarly be held to have had no meaningful choice.

utory negligence where an employee is injured due to a defect (whether design or otherwise) in an industrial accident while using a machine for its intended or foreseeable purposes.[6] The defendant manufacturer should not be permitted to escape from the breach of its duty to an employee while carrying out his assigned task under these circumstances when observance of that duty would have prevented the very accident which occurred.

Comparative negligence generally being applicable to measure the plaintiff's recovery in a strict liability context, what effect, if any, does that have upon the principle enunciated in *Bexiga* and *Finnegan*? The answer is none. Contributory negligence being unavailable as a defense, we fully agree with the Appellate Division that in this case comparative negligence does not come into play.

V

The trial judge charged the jury that to hold defendant liable, four elements had to be proved: (1) that the product had not been reasonably fit for the ordinary use for which it was intended; (2) that the defect arose out of defendant's design of the machine; (3) that the defect proximately caused plaintiff's injury or damage; and (4) that plaintiff was a reasonably foreseeable consumer or user of the product. Although this charge did not conform with the language of the instructions set forth in *Cepeda,* we are of the opinion that the charge under the facts of this case was substantially correct and in accord with the principles set forth in *Cepeda* with respect to the strict liability of a manufacturer for a design defect. The trial court's charge here generally conformed with the approach developed in our case law.

We have heretofore described the development of the strict liability doctrine commencing with *Henningsen v. Bloomfield*

---

[6]Of course, this is not to say that an employee who deliberately injures himself will be able to recover.

*Motors, Inc.*, 32 *N.J.* 358 (1960), and there is no need to retrace those steps. See *Heavner v. Uniroyal, Inc.*, 63 *N.J.* 130, 146–152 (1973). Historically the doctrine's underlying premise is that one engaged in the business of selling a product impliedly represents that goods which it places in the stream of commerce are free of defects, that is, they are reasonably suitable, safe and fit for the purposes for which those goods have been sold. *Herbstman v. Eastman Kodak Co.*, 68 *N.J.* 1, 7 (1975). Implicit in the product's presence on the market is the representation that it will safely perform the functions for which it was constructed. *Santor v. A & M Karagheusian, Inc.*, 44 *N.J.* 52, 64–65 (1965); *Greenman v. Yuba Power Products, Inc.*, 59 *Cal.*2d 57, 27 *Cal.Rptr.* 697, 377 *P.*2d 897 (1962). Fitness and suitability are terms largely synonymous with safety. *Cepeda* extended strict liability to include not only intended but also reasonably foreseeable uses of the product.

The principle of strict liability, shifting the focus from conduct, as in negligence law generally, to the product, may be summarized as follows. If at the time the seller distributes a product, it is not reasonably fit, suitable and safe for its intended or reasonably foreseeable purposes so that users or others who may be expected to come in contact with the product are injured as a result thereof, then the seller shall be responsible for the ensuing damages.[7] See *Newmark v. Gimbel's, Inc.*, 54 *N.J.* 585, 600 (1969). We have previously described strict liability in these terms. Justice Proctor in *Jakubowski v. Minnesota Mining & Manufacturing*, 42 *N.J.* 177, 184 (1964), referred to the necessity of showing that the product "was unfit for its intended purpose when purchased from the manufacturer." Justice Francis, in adopting the doctrinal theory of strict liability in tort in *Santor v. A & M Karagheusian, Inc., supra*, explained:

---

[7]Fitness and suitability are not limited to the commercial function of the product. Thus, the fact that the machine in *Cepeda* could make pellets did not satisfy the need that it be safe for the user.

Such doctrine stems from the reality of the relationship between manufacturers of products and the consuming public to whom the products are offered for sale. As we indicated in *Henningsen*, the great mass of the purchasing public has neither adequate knowledge nor sufficient opportunity to determine if articles bought or used are defective. Obviously they must rely upon the skill, care and reputation of the maker. 32 *N.J.*, at *p.* 384, 161 *A.*2d 412. It must be said, therefore, that when the manufacturer presents his goods to the public for sale he accompanies them with a representation that they are suitable and safe for the intended use. [44 *N.J.* at 64–65].

More recently, Justice Clifford in *Scanlon v. General Motors Corp.*, 65 *N.J.* 582, 591 (1974), explained, "A product is defective if it is not fit for the ordinary purposes for which such articles are sold and used."

■■■ It is incumbent upon plaintiff in proving strict liability to demonstrate that the product was defective when placed by defendant into the commercial stream. See, *e. g., Moraca v. Ford Motor Co.*, 66 *N.J.* 454, 460 (1975); *Scanlon v. General Motors Corp., supra*, 65 *N.J.* at 590; *Jakubowski v. Minnesota Mining & Manufacturing, supra*, 42 *N.J.* at 182. It is not necessary to show that defendant created the defect. What is important is that the defect did in fact exist when the product was distributed by and was under the control of defendant.

In many situations the nature of the alleged defect is clear. Imperfect material, a defective weld, or some physical damage in the product exemplify the usual claim. Proof of such defects may be demonstrated by direct evidence, by reasonable inferences which may be drawn from the circumstances or by exclusion of other causes. *Moraca v. Ford Motor Co., supra*, 66 *N.J.* at 458; *Scanlon v. General Motors Corp., supra*, 65 *N.J.* at 592–594.

We perceive that the only additional question to be put to the jury in a case involving a design defect, *vis-a-vis* other defects, is whether the product design was improper. In some improper design situations the nature of the proofs will be the same as in other unintended defect cases. This occurs when it is self-evident that the product is not reasonably suitable and safe and fails to perform, contrary to the user's reasonable expectation

that it would "safely do the jobs for which it was built." *Greenman v. Yuba Power Products, Inc., supra,* 59 *Cal.*2d at 64, 27 *Cal.Rptr.* at 701, 377 *P.*2d at 901. Thus, if one purchased a bicycle whose brakes did not hold because of an improper design, the manufacturer's responsibility would be clear without more. The product would not satisfy the reasonable expectations of the purchaser.

In a design defect case when this factor is absent, other than assuming that the manufacturer knew of the harmful propensity of the product, see *Cepeda, supra,* 76 *N.J.* at 172, "the question then becomes whether the defendant was negligent to people who might be harmed by that condition if they came into contact with it or were in the vicinity of it." Wade, "On the Nature of Strict Tort Liability for Products," 44 *Miss.L.J.* 825, 835 (1973). In the same article, Professor Wade, referring to improper design, wrote, "There is little difference here between the negligence action and the action for strict liability." *Id.* at 841. Dean Prosser has analyzed this proof problem by noting that "[s]ince proper design is a matter of reasonable fitness, the strict liability adds little or nothing to negligence on the part of the manufacturer * * *." *Prosser, supra,* § 99, at 659 n.72.[8] See generally Noel, "Recent Trends in Manufacturers' Negligence as to Design, Instructions or Warnings," 19 *Sw.L.J.* 43 (1965).

The proofs in this respect relate to the conduct of the manufacturer. Did the manufacturer act as a reasonably prudent person by designing the item as he did and by placing it on the market in that condition, or should he have designed it to incorporate certain safety features or some other modifications? Depending upon the proofs, some factors which may be con-

---

[8]In the analysis in *Cepeda* we said that the criterion of unreasonably dangerous was appropriate "if understood to render the liability of the manufacturer substantially coordinate with liability on negligence principles." 76 *N.J.* at 171–172.

sidered by the jury in deciding the reasonableness of the manufacturer's conduct include the technological feasibility of manufacturing a product whose design would have prevented or avoided the accident, given the known state of the art; and the likelihood that the product will cause injury and the probable seriousness of the injury. See *Cepeda, supra,* 76 *N.J.* at 174. We observe in passing that the state of the art refers not only to the common practice and standards in the industry but also to other design alternatives within practical and technological limits at the time of distribution.

However, it is the function of the court to decide whether the manufacturer has the duty and obligation imposed by the strict liability principle. As in tort law generally, determination of existence of a duty depends upon a balancing of the nature of the risk, the public interest and the relationship of the parties. We have previously adverted in *Cepeda, supra,* 76 *N.J.* at 173–174, to some of the factors to be considered.[9] The question is ultimately one of public policy, the answer being dependent upon a consideration of all relevant factors to decide what is fair and just. See *Brody v. Overlook Hospital,* 66 *N.J.* 448 (1975);

---

[9]See Wade, "On the Nature of Strict Liability for Products," 44 *Miss.L.J.* 825, 837–838 (1973); *Collins v. Ridge Tool Co.,* 520 *F.2d* 591, 594 (7th Cir. 1975), *cert.* den. 424 *U.S.* 949, 96 *S.Ct.* 1421, 47 *L.Ed.2d* 355 (1976); *Dreisonstok v. Volkswagenwerk, AG,* 489 *F.2d* 1066 (4th Cir. 1974); *Volkswagen of America v. Young,* 272 *Md.* 201, 218–220, 321 *A.2d* 737, 746–747 (1974); *Micallef v. Miehle Co.,* 39 *N.Y.2d* 376, 386, 384 *N.Y.S.2d* 115, 121, 348 *N.E.2d* 571, 577–578 (1976).

Dean Green has referred to the role of foreseeability of harm in determining whether a duty exists in the following manner:

Foreseeability may be a relevant factor for the judge to consider; other factors may and are usually more important in the determination of the defendant's duty; *the fact of risk in the particular case is what actually took place as a result of defendant's conduct, not what was foreseen by the actor as likely to take place,* and it is this risk that must be brought into focus by the court's judgment on the duty issue. [Green, "Duties, Risks, Causation, Doctrines," 41 *Tex.L.Rev.* 42, 58 (1962); emphasis in original]

*Newmark v. Gimbel's Inc.*, 54 *N.J.* 585, 596–597 (1969); *Caputzal v. Lindsay Co.*, 48 *N.J.* 69, 75 (1966). Dean Green has summarized the duty-risk approach in the following manner:

> The determination of the issue of duty and whether it includes the particular risk imposed on the victim ultimately rests upon broad policies which underlie the law. These policies may be characterized generally as morality, the economic good of the group, practical administration of the law, justice as between the parties and other considerations relative to the environment out of which the case arose. They are found in all decisions whether based on former decisions of the court or on a fresh consideration of the factors found in the current environment. It need not be added that the scope or extent of duty in any case can only be resolved by the learning, experience, good sense and judgment of the judge—the molding of law in response to the needs of the environment. [Green, "Duties, Risks, Causation, Doctrines," 41 *Tex.L.Rev.* 42, 45 (1962)]

Applying the same principle to strict liability actions, Dean Green, referring to § 402A of the *Restatement*, has written:

> It is the function of the trial judge, subject to appellate review, to determine whether in the particular case the law imposes liability on the seller for the violation of its duty to the injured consumer. [Green, "Strict Liability Under Sections 402A and 402B: A Decade of Litigation," 54 *Tex.L.Rev.* 1185, 1200 (1976)]

Although the considerations for the jury are somewhat comparable to those of the trial court, their decisional functions differ. The court decides what protection should be given and the jury is concerned with reaching a just result as between the parties.

Strict liability in a sense is but an attempt to minimize the costs of accidents and to consider who should bear those costs. See the discussion in Calabresi & Hirschoff, "Toward a Test for Strict Liability in Torts," 81 *Yale L.J.* 1055 (1972), in which the authors suggest that the strict liability issue is to decide which party is the "cheapest cost avoider" or who is in the best position to make the cost-benefit analysis between accident costs and accident avoidance costs and to act on that decision once it is made. *Id.* at 1060. Using this approach, it is obvious that the manufacturer rather than the factory employee is "in the better

position both to judge whether avoidance costs would exceed foreseeable accident costs and to act on that judgment." *Id.*

The same principles should apply whether the manufacturing defect is due to error or mischance or design. Though the nature of the proof to demonstrate that the product was defective may differ, the ultimate jury test is the same. Suitability and safety are implicated whether the defect in the product is due to an imperfection in the material or improper design.

We have previously stated that an appropriate strict liability charge should be given in terms of reasonable fitness, suitability and safety. Others have expressed this concept in similar terms. For example, Professor Wade refers to the test in terms of whether the product is duly safe. Wade, *supra,* 44 *Miss.L.J.* at 839–840.

Section 402A of the *Restatement,* however, provides that a seller of a product "in a *defective condition unreasonably dangerous*" will be subject to liability for harm caused thereby.[10] (Emphasis supplied). *Cepeda* adopts this language and suggests that a jury be charged as follows:

> A product is in a "defective condition unreasonably dangerous" if it is so likely to be harmful to persons or property that a reasonable prudent manufacturer who had actual knowledge of its harmful character would not place it on the market. It is not necessary to find that this defendant had knowledge of the harmful character of the product in order to determine that it was in a "defective condition unreasonably dangerous." [76 *N.J.* at 174]

*Cepeda* thus appears to have added another dimension to jury instructions in design defect cases. Incorporation of the "defec-

---

[10]Section 402 when originally adopted applied only to foods, and the term "unreasonably dangerous" was originally intended to apply only in that context. Later, the section was extended to include all products. See Wade, "On the Nature of Strict Liability for Products," 44 *Miss.L.J.* 825, 830–831 (1973).

tive condition unreasonably dangerous" language in the jury charge appears to impose a greater burden on plaintiff than is warranted, for it seems to require that plaintiff not only establish a defect but that in addition the condition created be unreasonably dangerous. It has been said inclusion of the phrase "unreasonably dangerous" in the *Restatement* formula is partially responsible for the confusion currently existing in products liability law. *U. S. Dep't of Commerce, Interagency Task Force on Product Liability, Product Liability*: 2 *Final Report of the Legal Study* 18 (1977).

The California Supreme Court has also rejected this language, in part because of the apparent imposition of a dual burden. *Cronin v. J. B. E. Olson Corp.*, 8 *Cal.*3d 121, 104 *Cal.Rptr.* 433, 501 *P.*2d 1153 (1972).[11] Professor Wade has commented that the *Restatement* language may lead a jury astray for "[i]t may suggest an idea like ultra-hazardous, or abnormally dangerous, and thus give rise to the impression that the plaintiff must prove that the product was unusually or extremely dangerous." Wade, *supra*, 44 *Miss.L.J.* at 832.[12]

---

[11]California has continued to adhere to the position stated in *Cronin*. In *Barker v. Lull Engineering Co., Inc.*, 20 *Cal.*3d 413, 143 *Cal.Rptr.* 225, 573 *P.*2d 443 (1978), a design defect case, the trial court had charged the jury that strict liability for a defect in design of a product is based on a finding that the product was unreasonably dangerous for its intended use. The California Supreme Court, in reversing a judgment in favor of the defendants, reaffirmed its determination in *Cronin* that the *Restatement*'s "unreasonably dangerous" gloss on defectiveness was confusing and unduly restrictive. The court stated:

> Indeed, in *Cronin* itself we expressly stated that our holding applied to design defects as well as to manufacturing defects * * *. [20 *Cal.*3d at 426, 143 *Cal.Rptr.* at 233, 573 *P.*2d at 451]

[12]The *Barker* court also adopted Professor Wade's thought in support of its rejection of the "unreasonably dangerous" language. 20 *Cal.*3d at 426 n.8, 143 *Cal.Rptr.* at 234 n.8, 573 *P.*2d at 452 n.8.

Defining the strict liability principle in terms of a defect and an unreasonably dangerous condition does not advance an understanding of the concept and will not assist a jury's comprehension of the issues which it must resolve. Accordingly, the jury should be charged in terms of whether the product was reasonably fit, suitable and safe for its intended or foreseeable purposes when inserted by defendant into the stream of commerce and, if not, whether as a result damage or injury was incurred by the contemplated users or others who might reasonably be expected to come in contact with it. This is not to say that the jury should not receive additional instructions relative to the nature of the alleged defect. For example, a product may be unsafe because of inadequate instructions or, as in this case, the absence of safety features. The instruction should be tailored to the factual situation to assist the jury in performing its fact finding responsibility.

 Delivery of an improperly designed machine constitutes delivery of a defective product. At that point, whether the cause of the defect in the product was due to design or otherwise is not material. See *Pike v. Frank H. Hough Co.*, 2 *Cal.*3d 465, 475, 85 *Cal.Rptr.* 629, 636, 467 *P.*2d 229, 236 (1970). Once the defect is established and the other elements shown, a case for strict liability has been made out.

The instructions in the instant case satisfactorily posed the issues to the jury. There was little, if any, dispute that the machine had not been properly designed and that it could have been with minor modification. The jury was instructed to ascertain if the unit had been defectively designed and, if so, whether the resulting condition proximately caused the injury to plaintiff as a reasonably foreseeable user. There was no need to

---

We note in passing that the "unreasonably dangerous" characterization conflicts with those situations where the plaintiff has been permitted recovery for economic losses such as in *Santor v. A & M Karagheusian, Inc.*, 44 *N.J.* 52 (1965).

charge that plaintiff had to show that the equipment was in a defective condition unreasonably dangerous to him.

## VI

In summary, then, we overrule *Cepeda v. Cumberland Engineering Co., Inc.,supra*, insofar as it held contributory negligence is a viable defense in a design defect case when plaintiff, an employee in an industrial setting, using the machine in an intended or reasonably foreseeable manner, is injured because of that defect, and in the absence of that defect the injury would not have occurred.

We hold that the Comparative Negligence Act is applicable in strict liability to those situations in which contributory negligence would have been a defense. However, we are not expanding the concept of contributory negligence, and comparative negligence is immaterial when no contributory negligence exists either factually or as a matter of law.

The trial court must determine whether the duty of strict liability exists. In doing so, it should weigh all pertinent risk/utility factors. When submitting the case to a jury, the court should charge generally that a manufacturer has an obligation to distribute products which are reasonably fit, suitable and safe for their intended or foreseeable purposes. If that obligation is violated and a user or others who may be expected to come in contact with the product are injured as a result, then the manufacturer is responsible for the ensuing damages. Design defect cases are covered as well within that context. In those design defect situations in which the defect is not self-evident, the trial court should also charge the jury on whether the manufacturer, it being deemed to have known of the harmful propensity of the product, acted as a reasonably prudent one. Depending on the proofs, the trial court should explain pertinent factors related to the determination of reasonable prudence. Other than this aspect, the design defect instruction should follow the usual pattern.

The judgment is affirmed.

CLIFFORD, J., concurring.

I concur in the judgment of the Court. And, most respectfully, in not much else it has done today. Particularly do I deplore the bluntly administered coup de grace to *Cepeda v. Cumberland Engineering Co., Inc.,* 76 *N.J.* 152 (1978), barely weaned and now the victim of judicial infanticide. I had thought that decision admirably embodied a method of analysis and of exposition which would serve the profession as a guide to the determination of future cases; but the Court has chosen to treat *Cepeda* as (to borrow Justice Stone's expression) "not better than an excursion ticket, good for [that] day and trip only * * *." Justice Harlan F. Stone, quoted in C. A. Miller, *The Supreme Court and the Uses of History* (1969). It appears that Jose Cepeda arrived at the station just a little too early.

In expressing my view I am not unmindful of the salutary principle that one casting a minority vote would do well to state one's reasoned position affirmatively and be done with it, rather than register criticism of any other filed opinion. But the majority's jurisprudential and doctrinal delinquencies in this case are such as to compel response, which I presume to make in order to explicate my own understanding of the field of law in which we find ourselves—one not without its complexities.

Would that my differences with the majority were limited to just its overruling of the precise holding of *Cepeda,* but unfortunately they are not. To demonstrate the scope of those differences it is perhaps well to start by pointing out exactly what it is the Court has done. As I understand it, henceforth contributory negligence in the sense of an unreasonable and voluntary exposure to a known danger will be available as a defense for a design-defect-strict-tort-liability case *only* with regard to an injury incurred outside the employee-factory machine setting. To the extent that *Cepeda* holds to the contrary—and the contrary is, of course, *Cepeda's* holding—it is overruled. In the process of making that determination the majority has run roughshod over *Cepeda's* thoughtful approach to design-defect-

strict-tort-liability, has rejected its suggested jury charge, and has upset this Court's recent express approval of the definition of strict liability found in *ALI Restatement, Torts, 2d, Section 402A* (hereafter *Rest.2d* Sec. 402A), in terms of a "defective condition unreasonably dangerous" for use. See *Cepeda,* 76 *N.J.* at 179. As indicated, I am in profound disagreement with all of this. Likewise do I reject the Court's reintroduction of warranty concepts into the analysis of this type of case, its reliance on negligence terminology, and its unhealthy mixing of the two. There is more involved here than mere exegetical or linguistic disputation. As I hope to demonstrate, our differences are fundamental and, I submit, substantial.

## I

The Court declares, *ante* at 174, that "an appropriate strict liability charge should be given in terms of reasonable fitness, suitability and safety," and that "[f]itness and suitability are terms largely synonymous with safety." *Ante* at 169. Let us pause right there for a moment. Plainly the language of "fitness" and "suitability" comes from the law of warranty, see, *e. g., Jakubowski v. Minnesota Mining & Manufacturing,* 42 *N.J.* 177, 184 (1964); *N.J.S.A.* 12A:2–314, 315, 316, 317, whereas "safety"—that is, "non-dangerousness"—is peculiarly a tort concept. While it is true, as *Cepeda* points out, that "strict liability in tort began here and elsewhere by borrowing warranty concepts in order to avoid the need of establishing negligence," 76 *N.J.* at 176, the more recent cases employ notions of tort, specifically as enunciated in *Rest.2d* Sec. 402A.[1] See particular-

---

[1] Confession of error is good not only for the soul but for an accurate view of the law. That being the case, I must advert to my opinion for the Court in *Scanlon v. General Motors Corp.,* 65 *N.J.* 582 (1974), wherein I wrote that "[a] product is defective if it is not fit for the ordinary purposes for which such articles are sold and used." The majority quite properly impales me upon the citation to my own language, *ante* at 170, which suffers from precisely the defect that I today undertake to criticize the majority for using. Given the operative facts of *Scanlon* and the references elsewhere in the opinion to

ly Justice Hall's tracing of the development of strict liability in tort in *Heavner v. Uniroyal, Inc.,* 63 *N.J.* 130, 146–52 (1973). By introducing fitness and suitability into the formula, the Court has suddenly transformed the manufacturer's duty. Heretofore the obligation has been to avoid marketing products which contain *harmful* defects, 76 *N.J.* at 174, henceforth it is to avoid putting in the stream of commerce goods which are unsuitable. This, before the ink is yet dry on our explicit rejection of the standard of "reasonable fitness": [2]

> The fact that the instant machine was commercially "reasonably fit for its intended purpose" of pelletizing plastic strands is obviously irrelevant to the postulate of strict tort liability to a workman injured by reason of the unsafety of the machine due to a design defect. [*Id.* at 176]

But no sooner do we digest this serving of warranty terminology in the majority opinion than we are dished up a negligence course. Now we discover that proofs in respect of proper design "relate to the conduct of the manufacturer. Did the manufacturer act as a reasonably prudent person by designing the item as he did and by placing it on the market in that condition * * * ?" *Ante* at 171. And: "In those design defect situa-

---

"dangerous condition," 65 *N.J.* at 593, and "unreasonably dangerous * * * defect," 65 *N.J.* at 594, together with the alternate ground of decision, 65 *N.J.* at 596–98, the outcome of that case would not have been any different had the correct language of "in a defective condition unreasonably dangerous" been employed in place of "not fit;" but the articulation of what constitutes a "defect" would not have stood out, as it does, as an unfortunate aberration in our strict tort liability law. The expression in *Scanlon* cannot be characterized as other than dead wrong.

[2]One notes in passing the majority's assertion, unencumbered by citation, that fitness and suitability are "not limited to the commercial function of the product" and do "not satisfy the need that it be safe for the user." *Ante* at 169 n.7. While this may of course be true, it hardly advances the discussion or supports the proposition that "fitness" and "suitability" are largely synonymous with safety. Certainly a product can be unfit or unsuitable without being unsafe; and, as the above excerpt from *Cepeda* demonstrates, it can be fit and suitable but still unsafe.

tions in which the defect is not self-evident, the trial court should also charge the jury on whether the manufacturer, * * acted as a reasonably prudent one." *Ante* at 177.

To appreciate the real vice of the stated observations of the Court, one need but return to *Cepeda,* which makes it abundantly clear that a plaintiff pursuing a strict-liability-in-tort claim for defective design need not prove the manufacturer's negligence under the traditional "conduct-oriented" terminology of the careful and reasonably prudent man. *Cepeda* explains that the parallel it draws between negligence on the one hand and the now familiar Wade-Keeton-*Rest.2d* Sec. 402A formula for design defect on the other, 76 *N.J.* at 172, relates to the balancing of risk and utility incident to a design defect cause of action. The central inquiry in the risk-utility analysis looks not to conduct but rather is this: whether the magnitude of the risk created by the dangerous condition of the product is outweighed by the social utility attained by putting it out in this fashion. See Wade, "On the Nature of Strict Tort Liability for Products," 44 *Miss.L.J.* 825, 834–35 (1973). See also P. Keeton, "Product Liability and the Meaning of Defect," 5 *St. Mary's L.J.* 30, 37–38 (1973). While this approach may, to be sure, encompass in a general way a notion of reasonable and prudent behavior on a manufacturer's part, more accurately it views the manufacturer's *conduct* as irrelevant. The focus is on the product, not conduct.

An excellent statement of this critical distinction is contained in the recent decision of the Iowa Supreme Court in the case of *Aller v. Rodgers Machinery Manufacturing Co., Inc.,* 268 *N.W.*2d 830 (Iowa 1978), expressly approved in the even more recent case of *Eickelberg v. Deere Co.,* 276 *N.W.*2d 442, 444 (Iowa 1979), which likewise comments approvingly on *Cepeda* at 276 *N.W.*2d at 444. In *Aller* the Iowa Supreme Court stated:

> This balancing process [weighing the utility of the article against the risk of its use] is the same as that used in negligence cases. This process is explained in Prosser, *Torts,* section 31, pp. 145–149, where it is stated:
>
> > \* \* \* [T]he real basis of negligence is not carelessness, but behavior which should be recognized as involving unreasonable danger to others. \* \* \* Against this probability [of harm] and gravity, of the risk, must be balanced in every case the utility of the type of conduct in question.
>
> We believe this similarity in balancing processes had led plaintiff to believe proof of negligence has been injected into proof of strict liability. Despite this similarity in balancing processes, there is a difference between the two theories of liability.
>
> In strict liability the plaintiff's proof concerns the condition (dangerous) of a product which is designed or manufactured in a particular way. In negligence the proof concerns the reasonableness of the manufacturer's conduct in designing and selling the product as he did. *Phillips v. Kimwood Machine Company,* 269 *Or.* [485] at 493–495, 525 *P.2d* [1033] at 1037. [268 *N.W.2d* at 835.]

So it is that *Cepeda* instructs us that after a trial court has determined, by application of several enumerated factors going to risk-utility, 76 *N.J.* at 174, that a case should go to the jury, the following model instruction fashioned by Dean Wade would (as modified) be appropriate for inclusion in the charge in a design defect case:

> A [product] is not duly safe if it is so likely to be harmful to persons [or property] that a reasonable prudent manufacturer [supplier], who had actual knowledge of its harmful character would not place it on the market. It is not necessary to find that this defendant had knowledge of the harmful character of the [product] in order to determine that it was not safe.

The modification referred to simply calls for substituting *Rest.2d* Sec. 402A language "defective condition unreasonably dangerous" for the model charge's "not duly safe."

It is well to note, in connection with this model instruction, that the jury is *not* being asked—as it would be in a negligence case—to evaluate *this* defendant manufacturer's conduct by application of the standard of reasonable prudence binding upon a hypothetical manufacturer who, in the exercise of reasonable

care, knows or should know of his product's dangerous propensity. The jurors are being told, in effect, not to concern themselves with that "negligence-type" question but just to assume that the defendant in court had that knowledge. The question becomes: given that presumed knowledge on the part of the manufacturer, can the product be deemed safe—that is, is its utility such as to outweigh the risks? The Oregon Supreme Court grasped the point when it said:

> The article can have a degree of dangerousness which the law of strict liability will not tolerate even though the actions of the designer were entirely reasonable in view of what he knew at the time he planned and sold the manufactured article. As Professor Wade points out, a way of determining whether the condition of the article is of the requisite degree of dangerousness to be defective (unreasonably dangerous; greater degree of danger than a consumer has a right to expect; not duly safe) is to assume that the manufacturer knew of the product's propensity to injure as it did, and then to ask whether, with such knowledge, something should have been done about the danger before the product was sold. In other words, a greater burden is placed on the manufacturer than is the case in negligence because the law assumes he has knowledge of the article's dangerous propensity which he may not reasonably be expected to have, had he been charged with negligence. [*Roach v. Konoven,* 269 *Or.* 457, 525 *P.2d* 125, 129 (1974).]

The modified Wade charge, simple enough, set forth above caused not one voice in this Court to be raised against it when approved only fifteen months ago. But today the majority casts it aside. Henceforth, as pointed out above, a jury in a design defect case will be charged in terms of a manufacturer's duty "to distribute products which are reasonably fit, suitable and safe * * * ", *ante* at 177; and in certain special types of design defect cases—namely, those in which the plaintiff does not rely upon reasonable expectations of consumers or users with regard to safety—"the trial court should also charge the jury on whether the manufacturer * * * acted as a reasonably prudent one." *Ante* at 177. With the greatest deference I suggest that my brothers of the majority, all of whom are

capable of some of the most precise thinking and most lucid judicial writing the bench and bar of this nation have been privileged to witness, have hardly simplified the jury's task by this obfuscation—a mixture of the apples of warranty with the oranges of negligence. I for one quite honestly do not understand how the trial judges and jurors are to go about their business; and if I do not, I venture to say there may be some of them who will share my dullness of comprehension.

This remarkable about-face on the critical point of the proper jury charge apparently stems from a recently contracted aversion to *Rest.2d* Sec. 402A's articulation of the strict liability principle in terms of a product which is in a "*defective* condition *unreasonably dangerous* to the user or consumer." (Emphasis supplied.) Remarkable, because after some considerable ambivalence on the question (see *Brody v. Overlook Hospital*, 66 *N.J.* 448, 451 (1975)), we last term deliberately and unequivocally adopted that formulation, *Cepeda*, 76 *N.J.* at 179, with no objection being registered. I would have thought the matter now entirely free from doubt. As Chitty, J., said (albeit in a different context) in *Lavery v. Pursell*, 30 *Ch.D.* 508, 517 (1888), "Courts of Justice ought not to be puzzled by such old scholastic questions as to where a horse's tail begins and where it ceases. You are obliged to say, 'This is a horse's tail,' at some time." The reversal of our position on this question is the more remarkable because the only reported case I can find in this jurisdiction which strikes down *Rest.2d* Sec. 402A's criterion of "unreasonably dangerous" is a Law Division opinion, *Glass v. Ford Motor Co.*, 123 *N.J.Super.* 599 (1973)—expressly overruled, again without so much as a word of protest, in *Cepeda*, 76 *N.J.* at 180. And perhaps most remarkable of all, because the majority's springboard for shunning "unreasonably dangerous" is a seven-year-old case severely criticized by most commentators and now even politely disapproved by the very court which decided it in the first place—*Cronin v. J.B.E. Olson Corporation*, 8 *Cal.*3d 121,

104 *Cal.Rptr.* 433, 501 *P.*2d 1153 (1972). *Cepeda* reviewed and rejected *Cronin*, 76 *N.J.* at 171 *n.*4, 178–79, noting in the process the California Supreme Court's modification of its *Cronin* doctrine. *Id.* at 171 *n.*4, 179. Phoenix-like, *Cronin* has arisen once again to obtrude into the Court's consideration factors which are completely irrelevant to—and, more pointedly, anachronistic in comparison with—the strict-liability-in-tort structure so painstakingly set forth in *Cepeda.*

*Cronin* can be viewed as the polestar of the line of cases which concluded (mistakenly, as I hope to demonstrate) that the "unreasonably dangerous" requirement of *Rest.2d* Sec. 402A required a plaintiff in a strict liability case to meet a burden which strict liability was developed to protect against. See discussion of *Escola v. Coca Cola Bottling Co.*, 24 *Cal.*2d 453, 150 P.2d 436 (1944) (Traynor, J., concurring), in *Cronin* at 8 *Cal.*3d 133, 104 *Cal.Rptr.* 442, 501 *P.*2d 1162. A somewhat extensive review of the premise underlying *Cronin* is unavoidable if there is to be a complete understanding of the narrow but exceedingly important question which now has our attention. The California Supreme Court was concerned that *Rest.2d* Sec. 402A terminology placed an unwarranted "dual burden" on the injured plaintiff. As indicated above, in effect the *language* seemed to require that the plaintiff prove that a defect existed and that the defect posed a condition which was unreasonably dangerous. Both of these requirements are dealt with in comments to the Restatement. Comment *g* explains that the requirement of "defective condition" limits application of Section 402A to those situations where "the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." An "unreasonably dangerous" product is defined, in circuitous fashion in Comment *i*, as one which is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who

purchases it, with the ordinary knowledge common to the community as to its characteristics."

The critical concern of the *Cronin* court was with these definitions. As noted by the California Supreme Court six years later in *Barker v. Lull Engineering Co., Inc.*, 20 *Cal.3d* 413, 143 *Cal.Rptr.* 225, 573 *P.2d* 443 (1978):

> As we noted in *Cronin*, the Restatement draftsmen adopted the "unreasonably dangerous" language primarily as a means of confining the application of strict tort liability to an article which is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." [*Rest.2d* Torts, § 402A, com. i.] In *Cronin*, however, we flatly rejected the suggestion that recovery in a products liability action should be permitted *only* if a product is more dangerous than contemplated by the average consumer, refusing to permit the low esteem in which the public might hold a dangerous product to diminish the manufacturer's responsibility for injuries caused by that product. As we pointedly noted in *Cronin*, even if the "ordinary consumer" may have contemplated that Shopsmith lathes posed a risk of loosening their grip and letting a piece of wood strike the operator, "another Greenman" should not be denied recovery. (8 *Cal.3d* at p. 133, 104 *Cal.Rptr.* 433, 501 *P.2d* 1153). Indeed our decision in *Luque v. McLean* (1972) 8 *Cal.3d* 136, 104 *Cal.Rptr.* 443, 501 *P.2d* 1163—decided the same day as *Cronin*—aptly reflects our disagreement with the restrictive implications of the Restatement formulation, for in *Luque* we held that a power rotary mower with an unguarded hole could properly be found defective, in spite of the fact that the defect in the product was patent and hence in all probability within the reasonable contemplation of the ordinary consumer.
>
> Thus, our rejection of the use of the "unreasonably dangerous" terminology in *Cronin* rested in part on a concern that a jury might interpret such an instruction, as the Restatement draftsman had indeed intended, as shielding a defendant from liability so long as the product did not fall below the ordinary consumer's expectations as to the product's safety.[7] As *Luque* demonstrates,

---

[7] This is not to say that the expectations of the ordinary consumer are irrelevant to the determination of whether a product is defective, for as we point out below we believe that ordinary consumer expectations are frequently of direct significance to the defectiveness issue. The flaw in the Restatement's analysis, in our view, is that it treats such consumer expectations as a "ceiling" on a manufacturer's responsibility under strict liability principles, rather than as a "floor." As we shall explain, past

the dangers posed by such a misconception by the jury extend to cases involving design defects as well as to actions involving manufacturing defects: indeed, the danger of confusion is perhaps more pronounced in design cases in which the manufacturer could frequently argue that its product satisfied ordinary consumer expectations, since it was identical to other items of the same product line with which the consumer may well have been familiar. [143 *Cal.Rptr.* at 233, 573 *P.2d* at 451.]

As the above rather lengthy excerpt indicates, the fears and concerns of the *Cronin* court are wholly irrelevant to *Cepeda's* view of design defect strict liability. The most cursory reading of *Cepeda* discloses that it does not use "consumer expectations" as a "ceiling" of strict liability nor does its definitional treatment of "defective condition unreasonably dangerous" rest in any measure on Comments *g* and *i* of *Rest.2d* Sec. 402A.

As *Cepeda* makes clear, a careful distinction must be made between ordinary manufacturing defects and design defects. 76 *N.J.* at 169. The issue in design-defect-strict-tort liability is not what was expected by the plaintiff but rather what the plaintiff actually received and used. Liability is not based on the foreseeability of the risk of harm occasioned by the design, for under the *Cepeda* formula "the requisite of foreseeability by the manufacturer of the dangerous propensity of the chattel" is imputed to the manufacturer. 76 *N.J.* at 174. In brief, the actual harm which occasioned the plaintiff's injury is traced backward, through hindsight, to the marketing of the product as designed. It is at this stage that the weighing process envisioned by *Cepeda* commences. That weighing process recognizes that the product was manufactured flawlessly as designed, but that the design selected may pose an unreasonable risk of harm when viewed against comparable designs, their costs, and their efficiencies. The test evolved from this balancing process, sim-

California decisions establish that *at a minimum* a product must meet ordinary consumer expectations as to safety to avoid being found defective.

ply put, asks of a jury whether the product contains that degree of dangerousness which, on balance, would have caused the manufacturer to refrain from putting it on the market. (See model charge *supra* at 143.[3]

It is quite clear that in *Barker* the Supreme Court of California, while not returning to Restatement language as used in *Cepeda*, nevertheless has corrected *Cronin* in ever so clear fashion as to bring California into substantial agreement with New Jersey on the precise nature of design-defect-strict-tort liability. I can find little, if any, difference between the risk/utility analysis proposed in *Cepeda*, 76 *N.J.* at 172–76, and the following approach presented in *Barker*:

> As Professor Wade has pointed out, however, the expectations of the ordinary consumer cannot be viewed as the exclusive yardstick for evaluating design defectiveness because "[i]n many situations * * * the consumer would not know what to expect, because he would have no idea how safe the product could be made." (Wade, *On the Nature of Strict Tort Liability for Products, supra*, 44 *Miss.L.J.* 825, 829.) Numerous California decisions have implicitly recognized

---

[3]I note in passing that several recent decisions have recognized that the "unreasonably dangerous" language of *Rest.2d* Sec. 402A does not involve an additional burden of proof on the plaintiff but instead operates to define defective condition. See *Vineyard v. Empire Machinery Co. Inc.*, 119 *Ariz.* 502, 581 *P.2d* 1152, 1155 (App.1978); *Barker v. Lull Engineering Co., Inc., supra*, 572 *P.2d* at 450–51; *Auburn Machinery Works Co. v. Jones*, 366 *So.2d* 1167, 1169–71 (Fla.1979); *Huff v. White Motor Co.*, 565 *F.2d* 104, 109–10 (7th Cir. 1977) (Indiana law); *Hunt v. Blasius*, 74 *Ill.2d* 203, 23 *Ill.Dec.* 574, 384 *N.E.2d* 368, 372 (1978); *Eickelberg v. Deere Co., supra*, 276 *N.W.2d* at 444 (Iowa 1979); *Phipps v. General Motors Corp.*, 278 *Md.* 337, 363 *A.2d* 955, 959 (Ct.App.1976); *Lovelace v. Astra Trading Corp.*, 439 *F.Supp.* 753, 758 (S.D. Miss.1977); *Roach v. Kovonen, supra*, 525 *P.2d* at 128 (Or.1974); *Kennedy v. Custom Ice Equipment Co., Inc.*, 246 *S.E.2d* 176, 178 (S.C.1978); *Community Television Services v. Dresser*, 435 *F.Supp.* 214, 216 (S.D.S.D.1977); *Ford Motor Co. v. Stead*, 574 *S.W.2d* 226, 229 (Ct.Civ.App.Tex.1978); *Lamon v. McDonnell Douglas Corp.*, 19 *Wash.App.* 515, 576 *P.2d* 426, 429–30 (Ct.App. Wash.1978), aff'd 91 *Wash.2d* 345, 588 *P.2d* 1346, 1350 (Wash.1978). *Cf. Brady v. Melody Homes Manufacturer*, 121 *Ariz.* 253, 589 *P.2d* 896, 898–99 (Ct.App.1978).

this fact and have made clear, through varying linguistic formulations, that a product may be found defective in design, even if it satisfies ordinary consumer expectations, if through hindsight the jury determines that the product's design embodies "excessive preventable danger," or, in other words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design. (*E. g., Self v. General Motors Corp., supra,* 42 *Cal.App.*3d [1] at p. 6, 116 *Cal.Rptr.* 575; *Hyman v. Gordon, supra,* 35 *Cal.App.*3d [769] at p. 773, 111 *Cal.Rptr.* 262; *Buccery v. General Motors Corp., supra,* 60 *Cal.App.*3d [533] at p. 547, 132 *Cal.Rptr.* 605.)

A review of past cases indicates that in evaluating the adequacy of a product's design pursuant to this latter standard, a jury may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design. [143 *Cal.Rptr.* at 236, 573 *P.*2d at 454–55; citations and footnote omitted.]

This view of design-defect-strict-tort liability is so much more refined than the approach taken in *Cronin,* and indeed so much more in keeping with the concept that a manufacturer's liability for defective design is best predicated upon the *harmfulness* of the product, that I am at a loss to understand the Court's assertion that "California has continued to adhere to the position stated in *Cronin.*" *Ante* at 175. It seems clear that more recent California decisions have embraced *Barker,* not *Cronin,* as the best expression of strict liability principles in California. See *Titus v. Bethlehem Steel Corp.,* 91 *Cal.App.*3d 372, 154 *Cal.Rptr.* 122, 126–28 (Ct.App.1979); *Korli v. Ford Motor Co.,* 86 *Cal.App.* 3d 417, 149 *Cal.Rptr.* 98, 109 (Ct.App.1978); *Garcia v. Joseph Vince Co.,* 84 *Cal.Rptr.*3d 868, 148 *Cal.Rptr.* 843, 847–48 (Ct.App. 1978); *McGee v. Cessna Aircraft Co.,* 82 *Cal.App.*2d 1005, 147 *Cal.Rptr.* 694, 702 (Ct.App.1978). In effect, *Barker* fielded the criticism leveled at *Cronin* and concluded that the risk-utility formula adds substance to the definition of design-defect-strict-tort liability. See especially *Titus v. Bethlehem Steel Corp., supra,* 154 *Cal.Rptr.* at 127, and discussion of *Barker* in *Brady v.*

*Melody Homes Manufacturer,* 121 *Ariz.* 253, 589 *P.*2d 896, 898–99 (Ct.App.1978).

Perhaps even more unfortunate than the reliance on *Cronin* is the majority's re-introduction of two features of strict liability in tort analysis which *Barker* tells us, 573 *P.*2d at 451, *Cronin* itself discarded, namely, "consumer expectations" and a conduct-oriented test of strict liability. *Ante* at 170–172. As for the former, the Court suggests that in "some improper design situations" design failure can be shown through proof that a product failed to perform up "to the user's reasonable expectation that it would 'safely do the jobs for which it was built.'" *Ante* at 171, quoting from *Greenman v. Yuba Power Products, Inc.,* 59 *Cal.*2d 57, 27 *Cal.Rptr.* 697, 377 *P.*2d 897 (1962). Given this resurrection of the much-maligned "consumer's expectation" test, one might reasonably inquire how this standard of "reasonable expectation that [the product] would safely do the jobs for which it was built" can be squared with the modern view that the product must be designed safely with an eye not simply toward use in the jobs for which it was built but for *each* and *every* use which is reasonably foreseeable. *Ante* at 176–177. Our strict-liability-in-tort law has come a long way since *Greenman,* relied on by the Court for its "consumer expectations" test. Today New Jersey takes a major step backward, one complicated by the Court's attempt to bifurcate design-defect-strict-tort liability between situations where the "factor" of "consumer expectations" is present, and those in which it is absent. In the latter the plaintiff's proofs "relate to the conduct of the manufacturer." *Ante* at 171. My objections to the "conduct" orientation of this approach have already been detailed herein. To those remarks I would add only the thought that this bifurcation hardly lends simplicity to an area of the law which could profit from some clarification.

Finally, I must record a diligent, although perhaps not exhaustive, effort to find anything to support the majority's use of

warranty language in combination with risk-utility factors—the "apples" and "oranges" referred to above. It has been an unproductive search. What has surfaced, however, is the clear preference of *Rest.2d* Sec. 402A language in the large majority of jurisdictions. I would cast my lot with the many states which within recent times have adopted or reaffirmed the language of "defective condition unreasonably dangerous" in the following cases: *Vineyard v. Empire Machinery Co., Inc.*, 119 *Ariz.* 502, 581 *P.2d* 1152, 1155 (App.1978); *Bendix-Westinghouse Automotive Air Brake Co. v. Latrobe Die Casting Co.*, 427 *F.Supp.* 34, 40 (D.Col.1976); *Slepski v. Williams Ford, Inc.*, 170 *Conn.* 18, 364 *A.* 2d 175, 178 (1975); *Auburn Machine Works Co., Inc. v. Jones*, 366 *So.2d* 1167, 1169–71 (Fla.1979); *Huff v. White Motor Corp.*, 565 *F.2d* 104, 106 (7th Cir. 1977); *Hunt v. Blasius*, 74 *Ill.2d* 203, 23 *Ill.Dec.* 574, 384 *N.E.2d* 368, 372 (Ill.1978); *Aller v. Rodgers Machinery Manufacturing Co., Inc., supra*, 268 *N.W.2d* at 833–35; *Eickelberg v. Deere Co., supra*, 276 *N.W.2d* at 444; *Bohnert Equip Co. v. Cleveland Crane & Eng. Co.*, 569 *S.W.2d* 161, 164 (Ky.1978); *Chappuis v. Sears, Roebuck & Co.*, 358 *So.2d* 926, 929 (La.1978) (Code equivalent); *Phipps v. General Motors Corp.*, 278 *Md.* 337, 363 *A.2d* 955, 958–60 (Ct.App.1976) (Statutory equivalent); *Lovelace v. Astra Trading Corp.*, 439 *F.Supp.* 752, 757 (S.D.Miss.1977); *O'Laughlin v. Minnesota Natural Gas Co.*, 253 *N.W.2d* 826, 829 (Minn.1977) (Statutory equivalent); *Winters v. Sears Roebuck and Co.*, 554 *S.W.2d* 565, 569 (Ct.App.Mo. 1977); *Brown v. North American Manufacturing Co.*, 576 *P.2d* 711, 716 (Mont.1978); *Tenney v. Seven-Up Co.*, 92 *N.M.* 158, 584 *P.2d* 205, 206 (Ct.App.1978); *Rudisaile v. Hawk Aviation Inc.*, 92 *N.M.* 578, 592 *P.2d* 175, 177 (1979); *Temple v. Wean United Inc.*, 50 *Ohio St.2d* 317, 364 *N.E.2d* 267, 270–71 (1977); *Stuckey v. Young Exploration Co.*, 586 *P.2d* 726, 730–31 (Okl.1978); *Wilson v. Piper Aircraft Corp.*, 282 *Or.* 411, 579 *P.2d* 1287, 1288 (1978) (rejects *Barker* in favor of 402A language approved for Oregon in *Roach v. Konoven, supra* ); *Kennedy v. Custom Ice Equip. Co.*, 246 *S.E.2d* 176, 178 (S.C.1978); *Community Television Serv-*

*ices, Inc. v. Dresser Ind. Inc.,* 435 *F.Supp.* 214, 216 (S.D.S.D. 1977); *Wyatt v. Winnebago,* 566 *S.W.2d* 276, 279 (Ct.App.Tenn. 1977); *Hamilton v. Motor Coach Ind. Inc.,* 569 *S.W.2d* 571, 574 (Ct.Civ.App.Tex.1978); *Kinney v. Goodyear Tire & Rubber Co.,* 367 *A.2d* 677, 679 (Vt.1976); *Lamon v. McDonnell Douglas Corp.,* *supra,* 576 *P.2d* at 428–29 (Ct.App.Wash.1978), aff'd, 91 *Wash.2d* 345, 588 *P.2d* 1346 (1979); *Schuldies v. Service Machine Co., Inc.,* 448 *F.Supp.* 1196, 1200 (E.D.Wis.1978).

## II

The jury in this case concluded that the machine in question was in a defective condition as designed and marketed by defendant.[4] It computed the total damages proximately resulting from that defective design at $25,000 and allocated fault at 50% each for plaintiff and defendant. Inasmuch as plaintiff's fault was determined to be "not greater" than that of defendant, judgment for plaintiff was entered, in keeping with that fault allocation, for one-half the amount of damages, or $12,500.

The Appellate Division, concluding that plaintiff's conduct, or fault, was not such as to permit application of comparative negligence principles, remanded the cause for entry of judgment for $25,000, the full amount of damages as determined by the jury. Specifically, the Appellate Division held that inasmuch as plaintiff's injury was "caused by the absence of a device intended to avoid the injury which occurred," this Court's decision in *Bexiga v. Havir Manufacturing Corp.,* 60 *N.J.* 402 (1972), fore-

---

[4]No question has been raised as to the propriety of the trial court's charge other than with respect to the instruction on plaintiff's conduct and the applicability of comparative negligence to a strict-liability-in-tort claim based on design defect. The trial court's terminology in respect to defendant's duty has not been put in issue.

closed the availability of plaintiff's conduct as a defense. The court below rejected defendant's claim that *Bexiga* is "no longer viable because of the enactment of the comparative negligence law in 1973."

The threshold question is the issue of plaintiff's conduct in a strict-liability-in-tort case based on design defect—that is, I would first determine whether there is any aspect of plaintiff's conduct which would serve to defeat his claim, tested by the law as it existed prior to enactment of the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1. In *Cepeda v. Cumberland Engineering Co., Inc., supra,* this Court examined at length the type of plaintiff's conduct which can be interposed against defendant's strict liability in tort, see discussion at 76 *N.J.* 183–88 *Cintrone v. Hertz Truck Leasing & Rental Service,* 45 *N.J.* 434 (1965); *Maiorino v. Weco Products Co.,* 45 *N.J.* 570 (1965); *Ettin v. Ava Truck Leasing, Inc.,* 53 *N.J.* 463 (1969); and *Bexiga v. Havir Manufacturing Corp., supra,* and concluded that conduct of the sort described in Comment *n., Rest.2d* Sec. 402A—namely, voluntary and unreasonable encountering of a known danger— would serve to bar plaintiff's claims. The Court has today completely undone that holding, preserving the defense of contributory fault only in those strict-tort-liability-design-defect cases which arise in some context other than the employee-factory machine setting.

I would preserve both the analysis and the precise holding of *Cepeda.* We there concluded that in this type of case a plaintiff's conduct must be viewed from two separate and distinct, although not entirely unrelated, perspectives. The first aspect of plaintiff's conduct bears on the defendant manufacturer's duty to protect against objectively foreseeable use of his product—including careless, negligent or abnormal use *where that kind of use is objectively foreseeable.* Accordingly, a plaintiff may, under the circumstances of a particular injury, be required

to demonstrate as part of his main case that the use of the product which occasioned the injury in question was foreseeable in an objective sense. This is the thrust of Comment *h*, *Rest.2d* Sec. 402A [5], adopted in *Cepeda, supra,* 76 *N.J.* at 176–77. However we characterize plaintiff's conduct which fails to meet the Comment *h* test—as misuse, abnormal use, alteration of product—the significant inquiry is whether plaintiff can demonstrate that the actual use was objectively foreseeable. 2 L. Frumer & M. Friedman, Products Liability § 16A[4][d] at 3B–76–77 (1976); V. Schwartz, "Strict Liability and Comparative Negligence," 42 *Tenn.L.Rev.* 171, 172 (1974). This has nothing to do with contributory negligence.

Perhaps a couple of illustrations, concededly somewhat primitive, will assist in demonstrating the point I seek to make here. If, for instance, a plaintiff undertakes to use his power saw as a nail clipper and thereby snips his digits, he will not be heard to complain of the absence of a guard—not because he is barred by any notion of contributory negligence but because the manufacturer has no duty to protect against that type of use of his product. Likewise with respect, say, to the man who decides to trim his beard with motorized hedge clippers not designed with

---

[5]Comment *h*, *Rest.2d Sec.* 402A reads in pertinent part as follows:

> h. A product is not in a defective condition when it is safe for normal handling and consumption. If the injury results from abnormal handling, as where a bottled beverage is knocked against a radiator to remove the cap, or from abnormal preparation for use, as where too much salt is added to food, or from abnormal consumption, as where a child eats too much candy and is made ill, the seller is not liable. Where, however, he has reason to anticipate that danger may result from a particular use, as where a drug is sold which is safe only in limited doses, he may be required to give adequate warning of the danger (see Comment j), and a product sold without such warning is in a defective condition.

Whereas the Comment is, by its terms, directed to food and drug products, as indeed all of Section 402A was originally, it now extends to all products. See Comment *b*, *Rest.2d* Sec. 402A.

a protective device to avoid the unintended abbreviation of his nose. Outrageous examples, to be sure, but they serve to illustrate the principle.

The other aspect of plaintiff's conduct critical to a design-defect-strict-tort-liability case goes to the availability of an affirmative defense. As *Cepeda* instructs us, "only a limited range of plaintiff's conduct—not contributory negligence in the sense of mere carelessness or inadvertence—can be a defense to an action for strict liability in tort." 76 *N.J.* at 185. Within that "limited range" is conduct by which plaintiff voluntarily and unreasonably proceeds to encounter a danger known to him. This is the formulation found in Comment *n*, *Rest.2d* Sec. 402A, specifically adopted in *Cepeda, supra*, 76 *N.J.* at 184–86, and reading in full as follows:

> Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery.

I would reaffirm and underscore the Comment *n* principle—applying it to all strict-tort-liability-design-defect cases—for the reason that "acceptance of ordinary contributory negligence as a defense in actions for strict liability in tort would be incompatible with the policy considerations which led to the adoption of strict tort liability in the first instance." 76 *N.J.* at 185, 386 *A.* 2d at 832.

This incompatibility stems from the nature of the duty imposed upon manufacturers to produce and market goods free from unreasonably dangerous defects. As *Bexiga* demonstrates, that duty in turn represents a frank recognition of salutary policy: a manufacturer has a responsibility to design its product so as to guard against not only those injuries which may arise in

the course of intended use but also against injuries which may result from foreseeable carelessness or negligence. See *Bexiga v. Havir Manufacturing Corp., supra,* 69 *N.J.* at 412; *Cepeda v. Cumberland Engineering Co., Inc., supra,* 76 *N.J.* at 186; Twerski, "Old Wine in a New Flask—Restructuring Assumption of Risk in the Products Liability Era," 60 *Iowa L.Rev.* 1, 20–22 (1974); Twerski, "The Use and Abuse of Comparative Negligence in Products Liability," 10 *Ind.L.Rev.* 797, 804–05 (1977).

In acknowledging that Comment *n, Rest.2d* Sec. 402A, accurately sets forth that kind of plaintiff's conduct—unreasonable, voluntary exposure to a known risk—which will support an affirmative defense to a strict-tort-liability claim, I note in passing the numerous jurisdictions which likewise have accepted this principle: See, *e. g., Dulin v. Circle F Industries, Inc.,* 558 *F.* 2d 456, 468 (8th Cir. 1977) (Ark.Law); *Good v. A. V. Chance Co.,* 565 *P.*2d 217, 222 (Colo.App.1977); *Hunt v. Harley-Davidson,* 147 *Ga.App.* 44, 248 *S.E.*2d 15, 16 (Ct.App.1978); *Sun Valley Airlines, Inc. v. Avco-Lycoming Corp.,* 411 *F.Supp.* 598, 602 (D.C.Id. 1976) (Idaho Law); *Clark v. Crane Carrier Co.,* 69 *Ill.App.*3d 514, 26 *Ill.Dec.* 41, 387 *N.E.*2d 871, 873 (Ill.App.1979); *Coty v. U. S. Slicing Mach. Co., Inc.,* 58 *Ill.App.*3d 237, 15 *Ill.Dec.* 687, 373 *N.E.*2d 1371, 1377–78 (Ill.App.1978); *Tri-State, Etc. v. Fid. & Cas. Ins. Co.,* 364 *So.*2d 657, 661 (La.App.1977); *Tulkku v. Macksworth Rees, Etc.,* 76 *Mich.App.* 472, 257 *N.W.*2d 128, 131–32 (Ct.App.1977); *Means v. Sears, Roebuck & Company,* 550 *S.W.*2d 780, 787 fn.6 (Mo.1977); *Brown v. North American Mfg. Co.,* 576 *P.*2d 711, 719 (Mont.1978); *Hagenbuch v. Snap-on Tools, Inc.,* 339 *F.Supp.* 676, 680–81 (D.C.N.H.1972) (New Hampshire Law); *Rudisaile v. Hawk Aviation, Inc., supra,* 592 *P.*2d at 177; *Olson v. A.W. Chesterton Co.,* 256 *N.W.*2d 530, 541 (N.D.1977); *Wyatt v. Winnebago Ind., Inc.,* 566 *S.W.*2d 276, 281–82 (Ct.App. Tenn.1977); *Mitchell v. Freuhauf Corp.,* 568 *F.*2d 1139, 1146 (5th Cir. 1978) (Texas Law); *Rigtup v. Strawberry Water Users Assn.,* 563 *P.*2d 1247, 1250 (Utah 1977); *Morningstar v. Black*

*and Decker Manufacturing Co.*, 253 *S.E.*2d 666, 683–84 (W.Va. 1979).

It is desirable to emphasize an important feature of this affirmative defense, namely, its requirement of a subjective analysis of the plaintiff's conduct. Was plaintiff actually aware of the danger posed by the product? Did plaintiff in fact see, know, understand and appreciate the danger, and nevertheless make a conscious decision to proceed in the face of it? Did occupational duress or common inadvertence color plaintiff's capacity to appreciate or avoid that risk of danger? See *Brown v. North American Mfg. Co.*, *supra*, 576 *P.*2d at 719; *Dulin v. Circle F Ind. Inc.*, *supra*, 558 *F.*2d at 468; Twerski, *op.cit.*, *supra*, 60 *Iowa L.Rev.* at 22–25; Twerski, *op.cit.*, *supra*, 10 *Ind.L.Rev.* at 811–14; Fischer, "Products Liability—Applicability of Comparative Negligence to Misuse and Assumption of the Risk," 43 *Mo.L.Rev.* 643, 660–63 (1978). These and other questions pertaining to an affirmative defense based on unreasonable, voluntary self-exposure to a known product hazard should not be permitted to become matters for speculation by a jury. They should be charged only in those cases where the trial court is satisfied that evidence exists which would indicate a plaintiff's actual knowledge of the product's danger and, further, his unreasonable and voluntary encountering of this harm.

The appropriate analysis is well-illustrated in *Coty v. U. S. Slicing Machine Co., Inc.*, *supra*. There recovery for personal injuries sustained by a worker in a fast-food restaurant was sought against the manufacturer of a meat slicer, based upon strict tort liability for design defect. The manufacturer appealed from a plaintiff's judgment entered upon a jury verdict, raising the issue of plaintiff's unreasonable and voluntary self-exposure to a known risk as set forth in *Rest.2d* Sec. 402A, Comment *n*. Defendant's duty and breach thereof presented no problem on appeal, inasmuch as the absence of an available guard, which could easily have prevented plaintiff's getting her

hand near the cutting blade, conclusively established the slicer as an unreasonably dangerous product. To determine the availability of the affirmative defense based on plaintiff's conduct, the Illinois court looked to the facts of the accident. These revealed that plaintiff, a fifteen-year-old girl,[6] had worked in the restaurant for over a year prior to the accident. On the occasion of her injury she was slicing meat on defendant's product by means of a stationary rotary blade and a movable tray which held the food product for slicing. The latter component was maneuvered back and forth over the rotating blade by reciprocal gears. Immediately prior to her injury the plaintiff had wrapped the meat in paper towels to prevent juicing, and when she attempted to remove excess paper which was being sliced with the meat during the cutting operation, her hand was moved by the meat and mechanized meat tray into the blade. The blade severed her hand.

The court treated the affirmative defense issue as follows:

> In this case plaintiff's conduct in removing the paper towels without switching off the power took place over a period of a few seconds in the midst of filling a customer's order. The evidence establishes that plaintiff made a split-second decision to reach for the paper towels, while the roast was farthest away from the blade, while standing in front of the machine without turning it off and without conscious thought that the operation of the equipment would thrust her hand almost immediately into contact with the revolving blade. The defendant has the burden of proving the defense of assumption of risk. There was neither direct evidence that plaintiff made an informed and voluntary decision to encounter the obvious risk posed by the unreasonably dangerous machine; nor

---

[6]The decision did not turn on the age of the employee, although that would, of course, be a factor in determining the nature and effect of plaintiff's conduct. See *Goss v. Allen,* 70 *N.J.* 442 (1976). The Illinois court pointed out that

> [i]t is not sufficient that a jury could draw the reasonable inference that a 15 year old girl would be aware of and would appreciate the danger in these circumstances. Plaintiff's action in seeking to remove the paper towel without stopping the machine must be deemed a "voluntary" act in order for it to constitute an assumption of the risk. [15 *Ill.Dec.* 694, 373 *N.E.2d* 1378.]

was there sufficient circumstantial evidence, considering plaintiff's age, experience, knowledge, understanding, the obviousness of the defect and the resulting danger, to permit a jury to draw a reasonable inference that plaintiff made a considered choice to encounter the danger. Therefore, the trial judge properly denied defendant's motion that the plaintiff had assumed the risk as a matter of law, and properly granted plaintiff's motion to find in her favor on the issue as a matter of law. [15 *Ill.Dec.* at 694, 373 *N.E.2d* at 1378.]

Applying the principles stated above to the case before us, it at once becomes apparent that plaintiff Suter's conduct did not give rise to an affirmative defense. Viewing his actions objectively one must conclude that Suter's use of the machine—working close to the operating mechanisms in proximity to the engagement gear—was an objectively foreseeable use. This, along with other factors in our case law bearing on the unreasonable dangerousness of the product, serves to support the jury's conclusion that the machine was defective as designed. However, examination of plaintiff's conduct under the subjective guidelines suggested by *Rest.2d* Sec. 402A, Comment *n,* leads to the conclusion that there was no evidence before the trial court of a considered choice to chance injury. Such a choice would necessarily have to have been made in Suter's instance with full knowledge and appreciation of the risk associated with the exposed lever's potential for sudden activation of the roller mechanism due to contact with an object, such as an operator's body, during the course of work. Rather, Suter's conduct was simply careless, and clearly so, entirely free of any element of deliberation. Hence, under my view of the case, whatever negligence may be attributable to plaintiff does not amount to contributory fault for purposes of defeating that liability which is imposed, as a matter of policy and law, upon the manufacturer of an unreasonably dangerous product.

The majority has elected, as a matter of policy, to rule out the application of Comment *n* conduct in the employee-factory machine setting. It is a policy decision, I suggest, without support in any case anywhere discoverable by diligent research, and

specifically I find no such support in *Bexiga, supra.* However, I will not here embark on the profitless undertaking of rehashing the respective sides of that argument, the object so recently of our energies in *Cepeda,* see 76 *N.J.* at 183–88 and 201–03, inasmuch as I cannot improve on Judge Conford's statement in that case of my position then and now.

I would add only this. I understand the bedrock of the policy adopted by the majority to be substantially as stated in Justice Schreiber's dissent in *Cepeda,* as follows:

> * * * [T]he law does not accept the [machine] user's ability to take care of himself as an adequate safeguard of the interests which society seeks to protect. This is particularly so with respect to employees, who generally have limited occupational choices * * * [A]s a matter of public policy and justice an employee should not be precluded from recovery because of remaining on the job. Accordingly some of the burden of looking out for the user is placed on the manufacturer. Furthermore, imposition of this burden should more probably lead to accident avoidance. [76 *N.J.* at 199–201.]

But if all this be true, why then should the defense of contributory fault be abolished *only* in the employee-factory machine setting? I take it that the Court today reserves that question, as perhaps well it should. While I would not (as the reader may by now have detected) abolish this defense under any circumstances—employment or otherwise—that I can presently imagine, I perceive no reason rooted in policy to distinguish the factory machine worker from, say, the sandblaster electrocuted in a water tank in *Dulin v. Circle F. Industries, Inc., supra.* Or from the electrician operating a boom device in *Good v. A. V. Chance Co., supra.* Or from the crane operator in *Clark v. Crane Carrier Co., supra.* Or from the restaurant employee in *Coty v. U. S. Slicing Machine Co. Inc., supra.* Or from the employee fixing a tire in *Tri-State, Etc. v. Fidelity & Cas. Insurance Co., supra.* Is it the thought that the limited occupational choices are more "institutionalized" in the employee-facto-

ry machine setting? I doubt it. But even if they are, why cannot the jury be entrusted to take that into account in determining whether the defendant manufacturer has successfully borne its burden of proving that the employee-plaintiff's encountering of a known risk was in truth both *voluntary* and *unreasonable*? In those rare cases—and I suspect they would be found on only rare occasion—where that burden of proof is sustained, I would not be at all affronted by the notion that the better accident-avoider and cost-avoider would be the employee guilty of Comment *n*-type fault.

### III

In the absence of the comparative negligence issue, my inquiry would go no further. But the central question of this appeal remains to be addressed, and that is whether the principles set forth in the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1, apply to a strict-liability-in-tort case based upon design defect. I would conclude that the statute applies. The bottom line is this: the conclusion stated in Part II hereof being that plaintiff Suter's conduct did not constitute that type of contributory fault which would completely foreclose any recovery under the pre-Comparative Negligence Act standard of contributory fault, neither can that conduct serve as a basis for reducing the liability of the defendant manufacturer or the amount of plaintiff's recovery under comparative negligence principles. The other side of that coin is that those principles should pertain where plaintiff's conduct rises to the level of unreasonable and voluntary self-exposure to a known risk. See generally, Twerski, *op.cit., supra,* 60 *Iowa L.Rev.* at 39–51; Twerski, "From Defect to Cause to Comparative Fault—Rethinking Some Product Liability Concepts", 60 *Marq.L.Rev.* 297, 342 (1977); *Teagle v. Fischer & Porter Co.,* 80 *Wash.2d* 149, 570 *P.2d* 438, 444–45 (1977); *Daly v. General Motors Corp.,* 20 *Cal.3d* 725, 144 *Cal.Rptr.* 380, 575 *P.2d* 1162, 1182 (dissenting opinion,

Mosk, J.); *Busch v. Busch Const. Inc.,* 262 *N.W.*2d 377, 394–95 (Minn.1977).

The above serves as both a preface and a conclusion to discussion of this issue, which has recently received considerable attention from both the academic community and the courts. See, *e. g.,* V. Schwartz, *Comparative Negligence,* 195–96 (1974); Twerski, "The Many Faces of Misuse: An Inquiry Into the Emerging Doctrine of Comparative Causation," 29 *Merc.L.Rev.* 402 *passim* (1978); Twerski, *op.cit., supra,* 60 *Marq.L.Rev.* 297 *passim*; Fischer, *op.cit., supra,* 43 *Mo.L.Rev.* 643 *passim*; Wade, *op.cit., supra,* 29 *Merc.L.Rev.* 373 *passim*; V. Schwartz, *op.cit., supra,* 42 *Tenn.L.Rev.* 171 *passim*; V. Schwartz, "Contributory and Comparative Negligence, A Reappraisal," 87 *Yale L.J.* 697 *passim* (1978); Note "Products Liability Comparative Negligence and the Allocation of Damages Among Multiple Defendants," 50 *S.Cal.L.Rev.* 73, 76–80 (1976); Note, "Comparative Fault and Strict Products Liability: Are They Compatible?", 5 *Pepperdine L.Rev.* 501 *passim*; *Butaud v. Suburban Marine Sporting Goods, Inc.,* 555 *P.2d* 42 (Alaska 1976); *Daly v. General Motors Corp., supra,* 575 *P.2d* at 1167–73; *Kinard v. Coats,* 553 *P.2d* 835 (Colo.App.1976); *Blackburn v. Dorto,* 348 *So.2d* 287 (Fla.1977); *Edwards v. Sears, Roebuck & Company,* 512 *F.2d* 276 (5 Cir. 1975); *Busch v. Busch Construction, Inc., supra,* 262 *N.W.* 2d 377 *passim*; *Melia v. Ford Motor Co.,* 534 *F.2d* 795 (8th Cir. 1975) (Neb.Law): *Kirkland v. General Motors Corp.,* 521 *P.2d* 1353 (Okl.1974); *Kennedy v. Providence Hockey Club, Inc.,* 376 *A.2d* 329 (R.I.1977); *Teagle v. Fischer & Porter Co., supra,* 570 *P.2d* at 444–45; *Pan-Alaska Fisheries v. Marine Const. & Design Co.,* 565 *F.2d* 1129 (9th Cir. 1977) (Wash.Law); *Dippel v. Sciano,* 37 *Wis.2d* 443, 155 *N.W.*2d 55 (1967).

It is well to start with the pertinent part of the text of the Comparative Negligence Act, adopted in 1973:

> Contributory negligence shall not bar recovery in an action by any person or his legal representative to recover damages for negligence resulting in death or

injury to person or property, if such negligence was not greater than the negligence of the person against whom recovery is sought, but any damages sustained shall be diminished by the percentage sustained of negligence attributable to the person recovering. [*N.J.S.A.* 2A:15–5.1.] [7]

As the majority observes, if one were to read the enactment literally, it would be easy to come a cropper, since it would appear that the comparative scheme extends only to actions "based upon negligence." Indeed, such a literal reading has led at least one court to reject the introduction of comparative negligence principles to strict tort liability. See *Kirkland v. General Motors Corp., supra*, 521 *P.2d* at 1367 (where Oklahoma Supreme Court's interpretation of statute nearly identical to New Jersey's focused upon essential doctrinal and semantic distinctions between strict liability and negligence; the ruling was that comparative negligence scheme could not be applied to

---

[7]The "not greater than" formula chosen by the Legislature represents one of the four common types of comparative negligence systems. These formulae are reviewed at length in V. Schwartz, *Comparative Negligence, supra* at 43–82. The comparative structure has been introduced both legislatively and judicially. Of the 32 states with comparative negligence as of late 1976, in 29 the change was effected by the former method. Sherman, "An Analysis of Pennsylvania's Comparative Negligence Statute," 38 *U.Pitt.L.Rev.* 51, 55 (1976). California, *Li v. Yellow Cab Co.*, 13 *Cal.3d* 804, 119 *Cal.Rptr.* 858, 522 *P.2d* 1126 (1975); Florida, *Hoffman v. Jones*, 280 *So.2d* 431 (Fla.1973); and Alaska *Kaatz v. State*, 540 *P.2d* 1037 (Alaska 1975), judicially adopted the "pure" form of comparative negligence. The "pure" scheme works to reduce a plaintiff's recovery in direct proportion to the percentage allocation of the plaintiff's fault. Mississippi has enacted this type by statute. 1972 *Miss. Code Ann.* § 11–7–17. Nebraska uses a "slight-gross" allocation system. *Neb.Rev.Stat.* § 25–1151. New Jersey's "not greater than" formula operates to reduce plaintiff's recovery where the allocation of plaintiff's fault is equal to or less than that of the defendant. Where the plaintiff's allocation is greater than that of the defendant, all recovery is barred. A majority of the statutes use this system with one minor change: where fault is equal, *i. e.*, 50%/50%, no recovery may be had. Wade, *op.cit., supra*, 29 *Merc.L.Rev.* at 373–74.

strict liability causes of action.) [8] See also *General Motors Corp. v. Simmons*, 558 *S.W.*2d 855, 862 (Tex.1977). But I think at this point one might profitably resurrect Judge Jerome Frank's oft-repeated (although not universally reliable) warning that

> [t]here is no surer way to misread any document than to read it literally * *. As nearly as we can, we must put ourselves in the place of those who uttered the words, and try to divine how they would have dealt with the unforseen situation; and, although their words are by far the most decisive evidence of what they would have done, they are by no means final. [*Guiseppi v. Walling*, 144 *F.*2d 608, 624 (2d Cir. 1944).]

In a word, I would join the majority in rejecting the literal approach and concentrate rather upon the reasoning in policy and law behind the adoption of comparative allocation of fault, leading to the result that this scheme must apply to strict tort liability. As already indicated, I would apply it "across the board."

The principal aim of comparative negligence formulae was to ameliorate the harsh result of the contributory negligence bar. As the Court observes, Governor Cahill recognized this design when he commented at the time of the law's enactment that "[n]o longer will a seriously injured person be prevented from obtaining compensation for his injuries merely because he was

---

[8]The literal variations in the comparative negligence laws of the several states also are numerous. New Jersey and the majority of jurisdictions use "negligence" to describe those forms of actions to which comparative may be referred. New York, on the other hand, uses "negligence" and "strict liability" in its laws. *N.Y.Civ.Prac.Law and Rules Art. 14–A § 1411, Practice Commentaries*, C1411:1 (McKinney's 1975). The Uniform Comparative Fault Act utilizes the words "in actions based on fault", and defines "fault" in this sense to include acts or omissions which subject a person to strict tort liability. Uniform Comparative Fault Act § 1(a), (b), reproduced in Wade, *op.cit., supra*, 29 *Merc.L.Rev.* at 392–401 (Appendix).

partially responsible in a minor way for the accident in which he was injured." Release from Office of the Governor, May 24, 1973. This is the common if not universal reasoning behind comparative fault enactments. See *e. g., Butaud v. Suburban Marine & Sporting Goods, Inc., supra,* 555 *P.*2d at 46; *Daly v. General Motors Corp., supra,* 575 *P.*2d at 1166; *Teagle v. Fischer & Porter Co., supra,* 570 *P.*2d at 443; Wade, *op.cit., supra,* 29 *Merc.L.Rev.* at 373; V. Schwartz, *Comparative Negligence, supra,* at 77–78.

The comparative fault scheme seeks to compel the balancing of the respective faults of the plaintiff and defendant. Fault, of course, is a generic term connoting legal culpability. In negligence, the defendant's fault corresponds to the failure to exercise the caution of the ordinary and prudent man under the circumstances of the occasion of injury, which failure proximately causes harm. The plaintiff's fault relates to his failure to act as a reasonably prudent person in regard to his own well-being, proximately resulting in his avoidable injury. "Fault" describes the law's view of the respective parties' relationships with the occurrence of injury.

Notions of "fault" likewise serve to support the policy considerations underlying the doctrine of strict liability. Perhaps the best statement of those considerations is found in Justice Traynor's famous concurring opinion in *Escola v. Coca Cola Bottling Co.,* 24 *Cal.*2d 453, 150 *P.*2d 436, 443–44 (1944):

> The cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer, and distributed among the people as a cost of doing business. It is to the public interest to discourage the marketing of products having defects that are a menace to the public. If such products nevertheless find their way into the market it is to the public interest to place the responsibility for whatever injury they may cause upon the manufacturer, *who even if he is not negligent* in the manufacture of the product, is responsible for its reaching the market. However intermittently such injuries may occur

and hazardly they may strike, the risk of their occurrence is a constant risk and a general one. Against such a risk there should be a general and constant protection and the manufacturer is best suited to afford such protection. [Emphasis in original.]

As spelled out heretofore, in my view the defendant-manufacturer's legal culpability is premised upon the marketing of an unreasonably dangerous product. Further, although the doctrine of strict liability in tort for product failure has evolved from the express salutary purpose of eliminating the difficulties inherent in proving a *negligence* case, *Escola v. Coca Cola Bottling Co., supra,* 150 *P.2d* at 441 (Traynor, J., concurring), there nevertheless remains the requirement that a plaintiff demonstrate defendant-manufacturer's *fault.* The strict liability doctrine is by no means the equivalent of liability without fault, nor does it mean that a manufacturer is a guarantor or insurer of its product. As the discussion *supra* has endeavored to make clear, the manufacturer has a duty in a strict-liability-design-defect case. It is to design its product so as to guard against injuries arising in the course of intended use, including those which may result from foreseeable carelessness or negligence. Breach of that duty proximately causing injury constitutes fault on the part of the manufacturer, in turn exposing it to legal liability unless it successfully establishes plaintiff's contributory fault.

And as the discussion in Part II hereof demonstrates, we have long recognized that a particular kind of plaintiff's fault pertains in strict liability cases. In *Cepeda, supra,* we said that the complete bar to recovery which would result from a jury's determination that plaintiff's unreasonable and voluntary exposure to a known risk proximately causing his injury could be viewed as "a fair balance of justice and policy." 76 *N.J.* at 190. The Legislature, in fashioning the remedy provided by the Comparative Negligence Act, has struck an even fairer balance in severely limiting those situations (*i. e.,* where plaintiff's

negligence is greater than defendant's) in which contributory fault remains as a complete bar.

I would therefore conclude that the term "negligence" found in the Comparative Negligence Act embraces that fault which heretofore has been operative in our strict-liability-in-tort doctrine. It follows from this that the only kind of plaintiff's conduct which can be permitted to reduce plaintiff's damages is that limited form which heretofore, under the principle of contributory negligence, would have barred his claim completely, namely, unreasonable and voluntary exposure to a known risk, or "Comment *n*" conduct.

Inasmuch as Suter's conduct did not constitute fault which would serve to bar his claim under the contributory negligence doctrine, neither can it form the basis for reducing his recovery under comparative fault principles. I therefore join in the judgment of the Court affirming the judgment below.

MOUNTAIN and SULLIVAN, JJ., join in this opinion.

*For affirmance*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—7.

*For reversal*—None.